TOWN HALL ESTATES–WHITNEY, INC., Crystal Long, Ronald Darren Long, and American Religious Town Hall Meeting, Inc., Appellants,

v.

Cathy Ann WINTERS, Appellee.

No. 10–04–00339–CV.

Court of Appeals of Texas, Waco.

Feb. 7, 2007.

**72**

Rex Davis, Sheehy Lovelace & Mayfield, Waco, for appellants.

Brad Newsom, Meridian, Richard G. Ferguson, Waco, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

This is a retaliatory-discharge case involving a nursing home employee, Cathy Winters, who alleged she was fired for reporting to her supervisor the possible sexual abuse of a nursing home resident by another employee. Cathy sued and prevailed, and the defendants appeal. We will modify the judgment in part and affirm it as modified.

## Texas Health and Safety Code Chapter 242: Duties Specific to Nursing Homes

Chapter 242 of the Texas Health and Safety Code governs nursing homes; its stated legislative goal is "to ensure that institutions in this state deliver the highest possible quality of care." TEX. HEALTH & SAFETY CODE ANN. § 242.001(a) (Vernon 2001). The Legislature directs us to construe chapter 242 broadly to accomplish the regulation of the operation of nursing homes in a manner that protects nursing home residents. *Id.* § 242.001(d-f).

This regulatory scheme includes, among other things, a statutory requirement for the oral and written reporting of abuse and neglect to the Texas Department of Human Services or a law enforcement agency. *See id.* §§ 242.122–.135 (Vernon 2001 & Supp.2006). A nursing home owner's or employee's failure to report under section 242.122 is a Class A misdemeanor. *Id.* § 242.131. In addition, section 242.133 prohibits retaliation for reporting a violation of law and provides nursing home employees who are retaliated against for reporting a violation of law with a retaliation cause of action:

(b) An employee has a cause of action against an institution, or the owner or another employee of the institution, that suspends or terminates the employment

of the person or otherwise disciplines or discriminates or retaliates against the employee for *reporting to the employee's supervisor,* an administrator of the institution, a state regulatory agency, or a law enforcement agency *a violation of law,* including a violation of this chapter or a rule adopted under this chapter, or for initiating or cooperating in any investigation or proceeding of a governmental entity relating to care, services, or conditions at the institution.

*Id.* § 242.133(b) (emphasis added).

An affected employee may recover: (1) the greater of $1,000 or actual damages, including mental anguish damages and lost wages; (2) exemplary damages; (3) court costs; and (4) attorney's fees. *Id.* § 242.133(c). The employee has the burden of proof, except there is a rebuttable presumption that the person's employment was suspended or terminated for reporting abuse or neglect if the person is suspended or terminated within sixty days after the date on which the person reported in good faith. *Id.* § 242.133(f).

## Background

In May 2000, Cathy, a nurse for almost thirty years, became employed by Town Hall Estates–Whitney, Inc. (Town Hall), a nursing home owned by American Religious Town Hall Meeting, Inc. (ARTH). Darren Long was Town Hall's administrator, and his wife Crystal was the assistant administrator. Both served on the boards of Town Hall and ARTH.

Cathy worked the night shift (11 p.m. to 7 a.m.) on Friday, June 29, 2001. On the morning of Saturday, June 30, A.R., an elderly female resident of Town Hall, complained to Cathy that overnight Pete Coviello, a certified nursing assistant (CNA), had exposed his penis to A.R. and made her touch it. Without giving him a reason, Cathy told Pete to stay out of A.R.'s room

the rest of the shift and asked the charge nurse, Beth Lewis, whether and how to write up the incident in A.R.'s chart. Lewis said she did not know, and nothing was written in A.R.'s chart. Cathy then called Fran Jackson, a floor nurse and Cathy's supervisor, at home, and reported A.R.'s allegation. According to Cathy, Jackson indicated that she wasn't happy to hear about the allegation. Because of A.R.'s history of false complaints and belligerence, both Cathy and Jackson were unsure about the truth of A.R.'s allegation;[1] Jackson testified that Cathy told her she felt she had a duty to report it to Jackson.

Jackson went to work that morning, spoke with Cathy again about the allegation, and then interviewed A.R., who repeated a similar allegation. Jackson wrote a summary of her interview with A.R. and then called Crystal Long, the assistant administrator, at home, and informed her of the situation. Jackson also relayed Cathy's report and Cathy's disbelief in the allegation. Two days later, the Longs terminated Cathy's employment, stating that she was being terminated for insubordination and progressive discipline.[2] This lawsuit for retaliatory discharge under section 242.133 against the Longs, Town Hall, and ARTH followed. See id. § 242.133(b).

A jury unanimously found that Cathy was terminated for reporting sexual abuse of a resident to her supervisor and awarded her $3,100 for lost wages, $20,000 in compensatory damages, and $34,200 for attorney's fees. Based on a finding that the Longs, Town Hall, and ARTH acted with malice in terminating Cathy's employment, the jury unanimously assessed exemplary damages against the Longs for $20,000 each, against Town Hall for $2,000, and against ARTH for $350,000. In accordance with the cap in Texas Civil Practice and Remedies Code section 41.008(b), the trial court reduced the exemplary damages

1. A.R. had a history of false complaints and of being disoriented at times. A.R. had complained to her visiting husband in March 2001 that Pete had slapped her. Darren had the director of nurses investigate this allegation and interview A.R., but she did not make a written report. Nor was the allegation reported to the Department of Human Services (DHS). This incident had occurred on Cathy's shift, but she did not learn of it until the next day. Cathy first spoke with A.R.'s husband and reminded him of A.R.'s history of false complaints, and he sounded satisfied after talking with Cathy. A few days later Cathy spoke with A.R., who recanted the slapping allegation. Cathy wrote a report on this incident, which included the following:

I never heard or saw Pete treat her in any manner other than a CNA in a professional manner. She never told me when I was alone with her of anything untoward that Pete had done. [A.R.] is not inhibitive when it comes to complaints, she has cursed me & called me names several times & I've seen her do the same with other staff members. She has also told her husband, me or another staff member untruths about her care, such as being dropped, having a shower, or whirlpool on the shift that I am working. They have always been untrue & when confronted, she always changes her mind. I don't know if it is deliberate, she has never appeared angry or upset when telling them or recanting.... Then I assured [A.R.'s husband] that I've worked [with] Pete for a while & that I've [] never seen nor heard any indications of Pete being abusive either verbally or physically.

2. About two hours later, the Longs reported the sexual abuse allegation to DHS, which dispatched a response team to investigate. Town Hall suspended Coviello only after the DHS team arrived. A few days later, the Longs, after being threatened by DHS with sanctions, contacted the police. DHS placed Town Hall in "Immediate Jeopardy Situation" and assessed a $3,050 per day penalty against Town Hall for not immediately suspending Coviello, and it temporarily canceled Town Hall's Medicare contract and denied payments for new residents. Coviello subsequently confessed and ultimately pled guilty to indecent exposure.

award against ARTH to $200,000 and otherwise entered a judgment based on the jury's findings.

## Was there a Report?

■ The first of Appellants' six issues asserts that section 242.133 does not apply because, as a matter of law, Cathy did not report an incident of abuse as contemplated by that statute. Appellants first argue that Cathy did not make a "report" because she did not believe A.R.'s allegation of sexual abuse.[3] Therefore, Appellants reason, if Cathy did not believe a violation of law had occurred, she could not have made a report of a violation of law under section 242.133. This superficially clever contention does not withstand scrutiny in the context of chapter 242 and the facts of this case.

It is not disputed that Cathy reported A.R.'s sexual abuse allegation to Jackson, her supervisor, orally, and to the Longs, in writing.[4] Instead, Appellants' first issue centers on the substance of Cathy's report. Essentially, Appellants' argument is that, because Cathy did not manifest a subjective belief in A.R.'s sexual abuse allegation, Cathy was not reporting a violation of law and section 242.133 simply does not apply. We reject Appellants' argument for several reasons.

■ First and foremost, it is not supported by the language of section 242.133, which we construe broadly to accomplish its purposes. *Id.* § 242.001(f); *cf. Rogers v. City of Fort Worth*, 89 S.W.3d 265, 274 (Tex.App.-Fort Worth 2002, no pet.) (stating that Whistleblower Act is remedial in nature and must be liberally construed). We should determine and give effect to the Legislature's intent, starting with the plain and common meaning of the words used. *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex.2003). If the statutory language is

---

**3.** *Gonzales v. Methodist Retirement Communities*, a summary judgment case relied on by Appellants, is inapposite. There, suit was brought under an earlier version of section 242.133 that provided a cause of action to an employee "for reporting the abuse or neglect or other complaint" to the employee's supervisors. *Gonzales v. Methodist Retirement Communities*, 33 S.W.3d 882, 883–84 (Tex. App.-Houston [14th Dist.] 2000, pet. denied) (quoting Act of June 20, 1997, 75th Leg., R.S., ch. 1159, § 1.25, 1997 Tex. Gen. Laws 4363, 4376 (amended 1999) (current version at Tex. Health & Safety Code Ann. § 242.133(a))). Gonzales came on duty at a nursing home and found that a resident had fallen from a geriatric chair. Gonzales's suit focused on the allegation that she was fired for reporting neglect to the medical director.

Applying the dictionary definition of neglect, the court concluded as a matter of law that Gonzales had not reported an incident of neglect. *Id.* at 884–85. Gonzales did not report that the resident had been neglected. She reported only that a resident had fallen out of a chair; she did not know why or how the resident had fallen, nor did she say or imply that the resident had been ignored and fell because of inattention. *Id.* at 885. That an employee may have been careless or negligent in the way they placed the resident in the chair did not translate into neglect under the statute. *Id.* "Thus, that a resident fell out of a chair into which she should have been buckled, is not, in and of itself, evidence that neglect—as that word is used in the statute—occurred." *Id.* We agree with Cathy that the facts in *Gonzales* bear no resemblance to this case. Here, Cathy's report to Jackson that A.R. had alleged sexual abuse—whether or not Cathy believed the allegation—unquestionably, and in and of itself, involved the report of a violation of law.

**4.** The fact that the Longs had decided to terminate Cathy before she tendered her written report is of no consequence to liability for retaliatory discharge. *See Clark v. Texas Home Health, Inc.*, 971 S.W.2d 435, 437 (Tex. 1998) (holding that anti-retaliation provision in Nurse Practice Act provided a cause of action to nurse who is the victim of retaliation in response to "reporting," not just for nurse who "had reported"; employer could not escape liability by demoting nurses before they could report).

unambiguous, we will interpret the statute according to its plain meaning. *Id.* We presume that the Legislature did not intend an unjust result. TEX. GOV'T CODE ANN. § 311.021(3) (Vernon 2005); *see also Univ. of Tex. Southwestern Med. Ctr. at Dallas v. Loutzenhiser,* 140 S.W.3d 351, 367 n. 20 (Tex.2004) (appellate court should not construe statute in manner that will lead to foolish or absurd result when another alternative is available).

In providing a cause of action for an employee who is retaliated against "for reporting . . . a violation of law" in section 242.133, the Legislature did not require that the employee subjectively believe there had been a violation of law. And we cannot think of a reason why—especially in a situation like this case where an elderly, disoriented nursing home resident with a history of false complaints has made a sexual abuse allegation to a nurse employee—the employee's subjective belief in the allegation should matter when the employee reports the allegation in accordance with her statutory duty to report. In the nursing home setting, we imagine that the abuse, neglect, or violation of law against a resident will not occur in plain view and that, as in this case, the original allegation will be made by the resident to another employee. Requiring that the employee know or subjectively believe the allegation to be true appears to us not only to add to the statute, but to add a requirement that contradicts the reality of nursing home abuse and neglect.[5] And it would appear unjust or absurd for the Legislature (1) to impose a legal duty on a nursing home employee to report abuse or neglect; (2) to

provide a cause of action for retaliation for reporting a violation of law (including abuse or neglect), but only if the employee subjectively believed there had been a violation of law; and (3) to omit from the statute such a subjective belief requirement. We cannot conceive that the Legislature would so frustrate a cause of action while creating it.

■ Appellants also argue that Cathy did not make a report contemplated by section 242.133 because Cathy did not comply with chapter 242's reporting requirements. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 242.122–.125. Turning again to the relevant statutory language, an employee must orally report abuse or neglect immediately upon learning of it and in writing no later than five days after the oral report. *Id.* § 242.122. The report must contain the name and address of the resident, the name and address of the person responsible for the care of the resident, and the address or phone number of the person making the report. *Id.* § 242.123. The report shall be made to the Department of Human Services or to a local or state law enforcement agency. *Id.* § 242.125.

Section 242.133, which creates the retaliation cause of action, makes no reference to the reporting requirements in sections 242.122–.125, unlike section 242.122(a), which requires the employee to "report the abuse *in accordance with this subchapter.*" (Emphasis added). In creating the retaliation cause of action, the Legislature could have easily required the employee to have reported "in accordance with this subchapter," but it didn't.[6] "[I]t would be a usur-

---

5. It is a class A misdemeanor to report abuse or neglect under subchapter E of chapter 242 in bad faith, maliciously, or recklessly. TEX. HEALTH & SAFETY CODE ANN. § 242.132 (Vernon 2001).

6. As Cathy points out, the Legislature knows how to specifically require that a report be in writing for it to serve as the basis for a report in a retaliation cause of action. In the statutes that create a retaliation cause of action for the reporting of another nurse who exposes a patient to a risk of harm or for other

pation of our powers to add language to a law where the legislature has refrained.... Courts should carefully search out a statute's intent, giving full effect to all of its terms. 'But they must find its intent in its language and not elsewhere. They are not the law-making body. They are not responsible for omissions in legislation.'" *Seay v. Hall,* 677 S.W.2d 19, 25 (Tex.1984) (quoting *Simmons v. Arnim,* 110 Tex. 309, 220 S.W. 66, 70 (1920)).

There are other obvious differences between section 242.133 and sections 242.122–.125, which serve different purposes:

- Section 242.122 requires an employee "who has cause to believe that the physical or mental health or welfare of a resident has been or may be adversely affected by abuse or neglect caused by another person" to "report *the abuse or neglect.*" *Id.* § 242.122(a) (emphasis added). Section 242.133, on the other hand, creates a retaliation cause of action for reporting *"a violation of law,* including a violation of this chapter or a rule adopted under this chapter, or for initiating or cooperating in any investigation or proceeding of a governmental entity relating to care, services, or conditions at the institution." *Id.* § 242.133(b) (emphasis added).

- Section 242.123 provides detailed requirements for the report. *See id.* § 242.123. Section 242.133 doesn't re-

quire any details; it merely requires "reporting ... a violation of law." *Id.* § 242.133(b).

- Section 242.125 requires that the report be made to the Department of Human Services or to law enforcement. *Id.* § 242.125. The reporting that is the basis of the retaliation cause of action can have been made "to the employee's supervisor, an administrator of the institution, a state regulatory agency, or a law enforcement agency." *Id.* § 242.133(b).

In conclusion, a report under sections 242.122–.125 undoubtedly can serve as the report that is the basis of a retaliation action under section 242.133, but nothing in these statutes supports Appellants' argument that Cathy's report must have been made in accordance with sections 242.122–.125 before the protection against retaliation is available.

For the above reasons, as a matter of law we hold that Cathy made reports of a violation of law as contemplated by section 242.133. We overrule Appellants' first issue.

## Sufficiency of the Evidence

 In their second issue, Appellants assert that the evidence is legally and factually insufficient to support the jury's finding that Cathy made a report and that she was retaliated against for making a report.[7]

---

reasons, the report must be written, signed, and include the identity of the nurse. *See* TEX. OCC.CODE ANN. § 301.402(b), (d) (Vernon Supp.2006) (report requirements); *id.* § 301.413 (Vernon 2004) (retaliation cause of action).

7. In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reason-

able jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 822 (Tex.2005). There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v.*

On Appellants' point that the evidence is legally and factually insufficient to show that Cathy made a report as contemplated by section 242.133, we agree with Cathy that their argument is the same one that they made in their first issue, which we have rejected. On their point that the evidence is legally and factually insufficient to show that Cathy was retaliated against for making a report, Appellants essentially are contesting the sufficiency of the evidence on causation.

No case has articulated a causation standard for a retaliation cause of action under section 242.133, but we find an almost identical retaliation cause of action in Health & Safety Code § 161.134 (providing a retaliation cause of action for employees of a hospital, mental health facility, or treatment facility). In a retaliation case under section 161.134, the Austin court applied the "but-for" causation standard applied in whistleblower and similar cases. *See Tomhave v. Oaks Psychiatric Hosp.*, 82 S.W.3d 381, 385 (Tex.App.-Austin 2002, pet. denied), *overruled on other grounds by Binur v. Jacobo*, 135 S.W.3d 646 (Tex. 2004). We will do likewise.

▮ Once an employer submits evidence that it would have taken adverse action in the absence of the report, the rebuttable presumption disappears and the

plaintiff must submit evidence of causation. *See id.* at 385; *Texas A & M Univ. v. Chambers*, 31 S.W.3d 780, 784 (Tex.App.-Austin 2000, no pet.). Cathy was required to prove by a preponderance of the evidence that the Appellants would not have terminated her employment when they did "but for" her report. *See Tomhave*, 82 S.W.3d at 385.

The Texas Supreme Court established a general causation standard to be applied in whistleblower and similar cases, stating "the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did." *Texas Dept. of Human Servs. v. Hinds*, 904 S.W.2d 629, 636 (Tex.1995). We see nothing in the Health and Safety Code that would cause us to depart from the "but-for" causation standard that has been applied in other whistleblower cases. *Id.* Thus, in order to prevail at trial, Tomhave would be required to prove by a preponderance of the evidence that the Hospital would not have terminated her employment when it did "but for" her report.

*Id.*

Appellants argue that Cathy was terminated for insubordination and for cumulative, progressive violations. Cathy did not

Havner, 953 S.W.2d 706, 711 (Tex.1997). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995)). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 183 (Tex. 1995).

When the party without the burden of proof at trial complains of the factual sufficiency of the evidence to support an adverse jury find-

ing, we must consider and weigh all of the evidence, not just the evidence that supports the verdict. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998); *Checker Bag Co. v. Washington*, 27 S.W.3d 625, 633 (Tex.App.-Waco 2000, pet. denied). We will set aside the finding only if it is so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Ellis*, 971 S.W.2d at 407. Reversal can occur because the finding was based on weak or insufficient evidence or because the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's contrary proof. *Checker Bag*, 27 S.W.3d at 633.

dispute that in 2000, when she was a new employee, she received a "Verbal Counseling Verification" because she had documented vital signs in the wrong chart. She explained that she was still learning the residents' names and room numbers and simply made a mistake. Cathy also received a "Written Warning Notification" for allowing an aide to administer prescription skin cream to a resident when only a nurse should have. Cathy explained that she did this during a busy shift and made a bad judgment. Conversely, Cathy's employment evaluations at Town Hall had been extremely positive.

Returning to the occasion in question, on the morning when Cathy called Jackson and told her of A.R.'s allegation, according to Cathy, Jackson said, "Please don't tell me this today. I don't need this today." Jackson also said to Cathy, "Oh shit, I'll have to call Darren on it." Jackson immediately called Crystal Long, the assistant administrator, at home, to inform her of this allegation and then went to work and spoke with Cathy again about the allegation, saying to Cathy, "Can't you go down there and make her tell the truth?" Jackson then interviewed A.R., who repeated the allegation to Jackson. Jackson wrote a summary of her interview with A.R. Jackson then called Crystal again and informed her of the situation, along with Cathy's disbelief in the allegation. Crystal told Jackson to have Cathy write a report. According to Cathy, that Saturday morning Jackson did not tell her to write a report, and no one contacted Cathy the rest of the day. Jackson said that she told Cathy to have a written report prepared by 7 a.m. Sunday morning, when Jackson would arrive for work.

Cathy worked the night shift on Saturday night/Sunday morning. She was surprised and upset to find that Pete was working that night and had not been suspended from working with patients. At the start of her shift, Cathy found a note from Jackson that said:

> You will need to write up a statement about the [A.R.]/Pete thing—I'll be here before you leave the shift to discuss this further with you. Pete is *NEVER* to go into that room *ever* again. I know that I told you that last time and Darren said he & Carol both said last time there was an encounter between the two that Pete wasn't to go back in that Rm. So, he should not have been in the Rm. Darren has been informed & will f/up on Monday. See ya in the morning. Thx.

Cathy did not interpret the note to mean that she should immediately write a report; she thought it could wait until Monday because Jackson had written that that was when Darren would follow up.[8] And because Cathy disputed that she had been told to keep Pete out of A.R.'s room, Cathy suspected from this part of Jackson's note that she was somehow going to be the "fall guy" or "scapegoat" for having reported A.R.'s sexual abuse allegation. When Jackson showed up the next morning (Sunday), she asked Cathy if she had written a statement yet, and Cathy, who was completing her shift paperwork, responded that because they had been short a CNA overnight, she had been too busy to prepare it. Jackson walked away, and Cathy finished her paperwork.

Soon, Jackson called Cathy into her office and presented her with a disciplinary "write-up" (a "Second Written Warning") for failing to follow the instruction to keep Pete from A.R.'s room, which had conse-

---

8. Jackson did not submit her written report to Crystal until Monday morning, but she was not reprimanded for that. Also, Jackson did not report A.R.'s allegation to DHS, and she was not disciplined for failing to do so.

quently resulted in another accusation by A.R. Crystal had told Jackson to do this write-up. Cathy was shocked by the write-up and refused to sign it because she considered it to be false—she disputed that anyone had told her to keep Pete from A.R.'s room. She explained that the instruction was not put in A.R.'s chart and that, if such a verbal instruction had been given to her, the director of nursing would also have been informed. Cathy said that Jackson, when questioned, admitted that no one else had been informed about the alleged instruction to keep Pete from A.R.'s room.[9] Cathy also told Jackson that Pete should not be working.

The write-up said nothing about Cathy's failure to have prepared a written statement by Sunday morning, despite Jackson's alleged oral instruction that she do so. After Cathy refused to sign the write-up, Jackson got "very mad" and left the office. Cathy testified that Jackson said nothing about preparing a written statement about A.R.'s allegation during the exchange in the office. Jackson's write-up also stated that Cathy was to prepare a written statement by 7 a.m. on July 1 (Monday). Jackson called Crystal, who told Jackson to write up a "Termination

Notification" for Cathy's insubordination in refusing to sign the "Second Written Warning" and for not having prepared the statement by Sunday morning.

Cathy then went home and, anticipating a busy Sunday night/Monday morning shift, decided that she would write the statement on her home computer. Crystal then called her at home and told her not to report for duty that night (Sunday) but to come in on Monday morning to talk to her and Darren. Cathy feared that she was going to be fired, but she wrote her statement anyway and brought it in the next morning when she met with Darren and Crystal. She gave the Longs a copy of the statement and had them sign it to evidence their receipt of it.

 In that meeting, the Longs notified Cathy that she was being terminated for insubordination for refusing to sign Jackson's write-up and for not preparing the written statement about A.R.'s sexual abuse allegation.[10] In the meeting, Cathy had a notepad with the word "scapegoat" and the letters "TDH" (for Department of Human Services) and its 1–800 phone number written on it. Cathy said that

---

9. After Cathy had refused to sign the write-up, Jackson wrote a note to Crystal; in it, Jackson wrote that she had talked to Pete that morning and he said to her that Cathy had told him to stay out of A.R.'s room after the alleged slapping incident "for a while" and that about a week later he had started to go back in to her room.

10. Jackson wrote the following in the termination notice:

> Insubordination, refused to sign 2nd written warning regarding above, did not write statement as requested. Stated to me that she had to work as an aide & nurse & that she doesn't even have enough time as it is, and that she wouldn't be writing this up tonight either because she wouldn't have enough time, but she did stay over until 8:33 a.m. to chart, she could've written a

statement and then clocked out but did not. Denied knowing that Pete was not to go into resident Rm, I did tell her myself. . . .

Crystal then added the following comments to the notice:

> Refusing to perform the nursing duty of making a written report upon an allegation of abuse is not only insubordination, it is against the law (see Senate Bill 9 for reference) and may further endanger the Resident if the report is not investigated. This is grossly negligent of the Resident and the Nurse's job. Termination is in order. . . . See attached statement by Ms. Winters written on 07–01–01 after C. Long requested meeting. Refused to do this for supervisor upon request but did after Asst. Adm. called her. Ms. Winters stated she "has been advised not to sign anything."

Crystal saw her notes, became agitated, and quizzed Cathy on whether she had called TDH. Cathy testified that she did not think the Longs were going to call TDH until Crystal saw Cathy's notes because the notes agitated Crystal and because they called TDH only after terminating Cathy. Crystal disputed Cathy's version, stating that Cathy claimed to have already called TDH. Cathy denied calling TDH, and no evidence shows that she actually did.

Courts recognize the inherent difficulty of producing direct evidence of an employer's improper motivation for terminating employment, particularly at the summary judgment stage of legal proceedings. *See Ruiz v. City of San Antonio,* 966 S.W.2d 128, 132 (Tex.App.-Austin 1998, no pet.) (citing *Castaneda v. Texas Dep't of Agric.,* 831 S.W.2d 501, 505 (Tex.App.-Corpus Christi 1992, writ denied)). Consequently, causation may be established by either direct or circumstantial evidence and reasonable inferences from such evidence. *Paragon Hotel Corp. v. Ramirez,* 783 S.W.2d 654, 658 (Tex.App.-El Paso 1989, writ denied). Factors including timing, adverse employment action taken soon after the protected activity; knowledge of the protected activity by employees making the decision to suspend or terminate employment; a negative attitude towards the protected activity; deviation from company policy or disparate treatment of similarly situated employees; and whether the stated reason for employment termination is false or only a pretext all can be considered circumstantial evidence that a report of unlawful activity caused or led to termination of employment. *Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996). While these factors are not exclusive, they reflect the type of circumstantial proof that could tend to establish causation in a retaliatory termination case. *Investment Props. Mgmt., Inc. v. Montes,* 821 S.W.2d 691, 694 (Tex.App.-El Paso 1991, no writ). *Id.* at 385–86; *see City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 69 (Tex.2000); *see also* CLAY A. HARTMANN & LAURA M. FRANZE, 2 TEXAS EMPLOYMENT LAW § 34:2 at 34–9 (2006) ("Causation may be established by direct or indirect evidence. Because most employers do not admit their decisions are retaliatory (i.e., direct evidence), most cases involve indirect or circumstantial evidence.").

 In this case, Appellants rebutted the presumption that Cathy was terminated for reporting A.R.'s sexual abuse allegation. Not surprisingly, no direct evidence of retaliation exists. Thus, we must address whether there exists legally and factually sufficient evidence that Appellants would not have terminated Cathy's employment when they did "but for" her report. *See Tomhave,* 82 S.W.3d at 385. Viewing the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, the causation factors above in the context of the evidence in this case show:

- *Timing:* Cathy was terminated two days after the protected activity (reporting A.R.'s allegation of sexual abuse).

- *Knowledge of the protected activity by employees making the decision to suspend or terminate employment:* The Longs knew that Cathy had reported A.R.'s allegation of sexual abuse to Jackson, Cathy's supervisor.

- *Negative attitude towards the protected activity:* Jackson reacted negatively when Cathy called her at home to report A.R.'s allegation of sexual

abuse, and Crystal became agitated when she saw Cathy's notes referring to the Department and its phone number. Ironically, Cathy had been told not to come to work (*i.e.,* suspended)—and the decision to terminate her also had been made—before Pete, the alleged perpetrator, was even suspended, and he wasn't suspended until after the DHS investigators had arrived.

- *Deviation from company policy or disparate treatment of similarly situated employees:* The alleged instruction to keep Pete from A.R.'s room after the recanted slapping allegation was not documented, and no other nurse was disciplined for not keeping him from A.R.'s room. And according to Jackson, Pete told her that Cathy had told him to stay out of A.R.'s room only "for a while," which he did for a week. Jackson, who also interviewed A.R. about the sexual abuse allegation and also wrote a report, was not disciplined for not turning in her report sooner to administration.

- *Whether the stated reason for employment termination is false or only a pretext:* Cathy presented credible evidence contradicting the allegations that she had failed to follow the undocumented instruction to keep Pete from A.R.'s room, that she had failed to follow the undocumented instruction to prepare her statement by Sunday morning, and that she had refused to prepare the statement.

 The jury may draw reasonable and logical inferences from the evidence. *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997). It is within the province of the jury to draw one reasonable inference from the evidence although another inference could have been

made. *See City of Keller,* 168 S.W.3d at 821.

The above indirect and circumstantial evidence, as a whole, is "more than a scintilla;" it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). And from this evidence reasonable jurors could draw a reasonable and logical inference that Cathy's employment would not have been terminated but for her report. Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we conclude that the evidence is legally sufficient to support the jury's finding that Cathy's employment would not have been terminated but for her report of A.R.'s allegation of sexual impropriety. *City of Keller,* 168 S.W.3d at 830.

 Viewing all the evidence in a neutral light, we find that it is factually sufficient to support the jury's finding. We cannot say that the finding is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). Reasonable jurors could disbelieve Appellants' testimony on why Cathy's employment was terminated; their testimony was unsupported by any documentation in a setting—instructions on patient care and employee discipline in a nursing home—that expects documentation. When conducting a factual sufficiency review, we do not pass on the credibility of the witnesses or substitute our judgment for that of the trier of fact. *See Dallas County v. Holmes,* 62 S.W.3d 326, 329 (Tex.App.-Dallas 2001, no pet.). There were conflicts in the testimony, but we will not substitute our judgment for that of the jury's. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757,

761 (Tex.2003) ("[T]he jury is the sole judge of the credibility of witnesses and the weight to be given their testimony."). It is the jury's role "to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses." *Ford v. Panhandle & Santa Fe Ry.*, 151 Tex. 538, 252 S.W.2d 561, 563 (1952). We overrule issue two.

### Piercing the Corporate Veil

 ARTH, the parent corporation of Town Hall, complains in its third issue that the evidence is legally and factually insufficient to support the jury's finding that ARTH retaliated against Cathy. The jury found that both Town Hall and ARTH retaliated against her.

 Various theories exist for "piercing the corporate veil" or disregarding the corporate form.[11] These theories must be specifically pleaded or they are waived, unless they are tried by consent. *See Mapco, Inc. v. Carter*, 817 S.W.2d 686, 688 (Tex.1991). We need not decide whether Cathy pled a theory for piercing the corporate veil because ARTH does not argue that she did not, and it otherwise appears to have been tried by consent. The only pleading to support a theory for piercing the corporate veil is the allegation that ARTH was the parent company of Town Hall and provided Town Hall with its personnel policies. We construe it to be a pleading of alter ego.

[D]isregard of the "legal fiction of corporate entity" is "an exception to the general rule which forbids disregarding corporate existence." *Lucas v. Texas Industries, Inc.*, 696 S.W.2d 372, 374 (Tex.1984); *First National Bank in Canyon v. Gamble*, 134 Tex. 112, 132 S.W.2d 100 (1939).

Generally, a court will not disregard the corporate fiction and hold a corporation liable for the obligations of its subsidiary except where it appears the corporate entity of the subsidiary is being used as a sham to perpetrate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances. *Lucas*, 696 S.W.2d at 374–75. *See also, Torregrossa v. Szelc*, 603 S.W.2d 803 (Tex.1980); *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340 (1955). There must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's tort. *Lucas*, 696 S.W.2d at 374–75; *Hanson Southwest Corp. v. Dal–Mac Construction Co.*, 554 S.W.2d 712 (Tex.Civ.App.-Dallas 1977, writ ref'd n.r.e.); *see also Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d

---

11. Those theories are:
- when the fiction is used as a means of perpetrating fraud; (*Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex.1986))
- where a corporation is organized and operated as a mere tool or business conduit of another corporation ("alter ego"); (*Id.*)
- where the corporate fiction is resorted to as a means of evading an existing legal obligation; (*Id.*)
- where the corporate fiction is employed to achieve or perpetrate monopoly; (*Id.*)
- where the corporate fiction is used to circumvent a statute; (*Id.*)
- where the corporate fiction is relied upon as a protection of crime or to justify wrong; (*Id.*)
- inadequate capitalization so as to work an injustice; (*Id.* at 272 n. 3) and
- two or more businesses were operated as a single business enterprise. *Paramount Pet. Corp. v. Taylor Rental Ctr.*, 712 S.W.2d 534, 536 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.); *Allright Tex. v. Simons*, 501 S.W.2d 145, 149–50 (Tex. App.-Houston [1st Dist.] 1973, writ ref'd n.r.e.).

336 (Tex.1968). The corporate entity of the subsidiary must have been used to "bring about results which are condemned by the general statements of public policy which are enunciated by the courts as 'rules' which determine whether the courts will recognize their own child." *Lucas,* 696 S.W.2d at 374–375; *Roylex, Inc. v. Langson Brothers Construction Co.,* 585 S.W.2d 768 (Tex.Civ.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.); *Sutton v. Reagan & Gee,* 405 S.W.2d 828 (Tex.Civ.App.-San Antonio 1966, writ ref'd n.r.e.). The plaintiff must prove that he has fallen victim to a basically unfair device by which a corporate entity has been used to achieve an inequitable result. *Lucas,* 696 S.W.2d at 374–75; *Torregrossa,* 603 S.W.2d at 803; *Preston Farm & Ranch Supply, Inc. v. Bio–Zyme Enterprises,* 615 S.W.2d 258 (Tex.Civ.App.-Dallas), *aff'd,* 625 S.W.2d 295 (Tex.1981).

*Cementos de Chihuahua, S.A. de C.V. v. Intermodal Sales Corp.,* 162 S.W.3d 581, 585–86 (Tex.App.–El Paso 2005, no pet.); *see also BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 798–99 (Tex. 2002).

The evidence relied on by Cathy to pierce the corporate veil and reach ARTH, Town Hall's parent, is: (1) the Longs were members of the boards of directors of both ARTH and Town Hall; (2) one sentence in Town Hall's personnel manual generally refers to "employees of Town Hall and ARTH;" and (3) ARTH's president testified that he had the authority to discipline and terminate Darren. This evidence is legally insufficient to support a finding that ARTH is vicariously liable for Town Hall's retaliation liability under an alter ego theory.[12] *See BMC Software,* 83 S.W.3d at 799. We sustain ARTH's third issue. Because of our holding that ARTH is not liable for Town Hall's retaliation, we need not address issues four (as to ARTH), five, and six on the exemplary damages awarded against ARTH.

## Malice

In issue four, Appellants contend that the evidence is legally and factually insufficient to support the jury's finding by clear and convincing evidence that any appellant acted with malice.

When a jury makes an affirmative finding of malice that is required to be based on clear and convincing evidence, in conducting a legal sufficiency review we review all the evidence in the light most favorable to the jury's finding, taking into account contrary undisputed facts, to determine whether reasonable jurors could have formed a firm belief or conviction regarding malice. *Qwest Int'l Communications, Inc. v. AT & T Corp.,* 167 S.W.3d 324, 326 (Tex.2005); *see also Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 627 (Tex.2004) (reviewing court must assume factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could and disregard all evidence a reasonable factfinder could have disbelieved or

---

**12.** This evidence would also be legally insufficient under a single business enterprise theory, which some courts consider to be a separate and distinct theory from alter ego. *See North Am. Van Lines v. Emmons,* 50 S.W.3d 103, 119 (Tex.App.-Beaumont 2001, pet. denied). Factors to be considered in determining whether two corporations have not been maintained as separate entities include the following: common employees; common offices; centralized accounting; payment of wages by one corporation to another corporation's employees; common business name; services rendered by the employees of one corporation on behalf of another corporation; undocumented transfers of funds between corporations; and unclear allocation of profits and losses between corporations. *Paramount,* 712 S.W.2d at 536. No evidence of any of these factors exists in this case.

found to have been incredible); *In re J.F.C.*, 96 S.W.3d 256, 264–68 (Tex.2002).

When reviewing the factual sufficiency of the evidence to support a finding required to be based on clear and convincing evidence, we must give due consideration to any evidence the factfinder could reasonably have found to be clear and convincing. *J.F.C.*, 96 S.W.3d at 266–67. We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of its finding is so significant that a factfinder could not have reasonably formed a firm conviction or belief. *Id.* (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002)). Both legal and factual sufficiency reviews of a finding required to be based on clear and convincing evidence must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter required to be established by clear and convincing evidence. *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25.

The trial court asked the jury whether it found by clear and convincing evidence that Cathy was terminated as a result of malice, defining malice as follows:

(a) a specific intent by defendants to cause substantial injury to plaintiff Cathy Ann Winters; or

(b) an act or omission by defendants,

(i) which when viewed objectively from the standpoint of defendants at the time of its occurrence, involved an extreme degree of risk, considering

the probability and magnitude of the potential harm to others, and

(ii) of which defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

*See* Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109 (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7) (Vernon Supp. 2006)).[13] We thus focus our review on whether there was clear and convincing evidence that the defendants terminated Cathy's employment with malice as defined in the charge.

Gross negligence and malice may be proved by direct or circumstantial evidence. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994). Evidence of retaliation alone is generally insufficient to support an award of punitive damages; otherwise, punitive damages would be awarded automatically in every retaliation case. *See Continental Coffee Products Co. v. Cazarez*, 937 S.W.2d 444, 454 (Tex.1996); *Ancira Enter's., Inc. v. Fischer*, 178 S.W.3d 82, 94 (Tex.App.-Austin 2005, no pet.). We thus focus on evidence other than the fact of retaliation.

In other retaliation contexts, knowledge by the employer of laws prohibiting retaliation and that the employer is violating the employee's legal rights has been found to be some evidence of malice. *See Tesmec USA, Inc. v. Whittington*, 2006 WL 827849, at *7 (Tex.App.-Waco Jan. 18, 2006, pet. denied) (mem. op.); *Fischer*, 178 S.W.3d at 94–95. The Longs demonstrated detailed knowledge of the law on re-

---

**13.** In 2003, the Legislature removed subpart (b) ("gross-negligence malice") from the malice definition, recodifying it as the definition of "gross negligence." *See* TEX. CIV. PRAC. & REM.CODE ANN § 41.001(11).

porting nursing home abuse and neglect, including many references to "Senate Bill 9," which is what they called that law and the written statement that nursing home employees are required to sign to show that they realize they may be criminally liable for failing to report abuse or neglect. *See* TEX. HEALTH & SAFETY CODE ANN. § 242.122(b) ("Each institution shall require each employee of the institution, as a condition of employment with the institution, to sign a statement that the employee realizes that the employee may be criminally liable for failure to report those abuses."). The anti-retaliation statute also provides that a nursing home shall require each employee of the institution, as a condition of employment with the institution, to sign a statement that the employee understands the employee's rights under this section, and that the statement must be part of the statement required under section 242.122. *See id.* § 242.133(h). Therefore, there is circumstantial evidence that the Longs knew that they were violating the law and Cathy's legal rights, and reasonable jurors could have credited that evidence in their malice finding.

 Courts also consider that evidence of economic incentive—that money was a factor—in a retaliatory termination, combined with other factors, can be sufficient to establish malice. *See Tesmec*, 2006 WL 827849, at *7; *Whole Foods Mkt. Southwest L.P. v. Tijerina*, 979 S.W.2d 768, 780 (Tex.App.–Houston [14th Dist.] 1998, pet. denied). As we noted in footnote 2, Town Hall was subjected to sanctions and penalties as a result of the report to DHS. Given Cathy's testimony that she did not think the Longs were going to report the abuse, the undisputed fact that they did not report it until they had terminated Cathy's employment, and Cathy's testimony about Crystal's agitation upon seeing Cathy's note with DHS's 1–800 number

and her quizzing of Cathy on whether she had already called DHS, there is circumstantial evidence that the Longs were not going to report the abuse and that they terminated Cathy's employment in an attempt to avoid having to report it because they feared the financial repercussions from a DHS investigation. Reasonable jurors could have credited that evidence in their malice finding.

We have also detailed the evidence on how Cathy was treated differently than other Town Hall employees who committed similar alleged acts, and how Coviello, the alleged perpetrator of the sexual abuse, was not suspended until the state investigation had begun. This singling-out of Cathy is circumstantial evidence that reasonable jurors could have credited as evidence of specific intent to cause substantial injury to Cathy.

Finally, there was evidence that, in a subsequent state nursing board investigation of Cathy regarding her handling of A.R.'s sexual abuse allegation, Town Hall furnished the board with an updated version of its policies and procedures manual that was not in effect during Cathy's employment at Town Hall. As a result, Cathy's conduct looked worse before the board in that her conduct violated many of the updated abuse reporting policies that were not in effect during her employment. Cathy was placed on two years' probation. The Longs called the furnishing of the updated manual a mistake and disclaimed any intent to harm Cathy. Although this incident occurred about a year after Cathy's termination, it is circumstantial evidence that a reasonable juror could have credited as evidence of specific-intent malice or gross-negligence malice. *Cf. Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986) (a party's fraudulent intent is determined at the time of the party's conduct in question, but it may be

inferred from the party's subsequent acts); *Yeldell v. Goren,* 80 S.W.3d 634, 637 (Tex. App.-Dallas 2002, no pet.) (same).

There is no contrary undisputed evidence to consider in our sufficiency review of the malice finding. *Cf. Garza,* 164 S.W.3d at 628. The jury could have found the Longs' testimony on malice, their intent, and their reason for terminating Cathy's employment to have been incredible. *See City of Keller,* 168 S.W.3d at 822; *Vaughn v. Drennon,* 202 S.W.3d 308, 324 (Tex.App.-Tyler 2006, no pet. h.); *see also Wilen v. Falkenstein,* 191 S.W.3d 791, 801 (Tex.App.-Fort Worth 2006, pet. denied) (jury free to discredit defendant's protestation that no harm was intended) (citing *Twyman v. Twyman,* 855 S.W.2d 619, 623 (Tex.1993)). The evidence is sufficient to produce in the mind of the trier of fact a firm belief or conviction that the harm suffered by Cathy resulted from malice. We overrule issue four.

## Conclusion

Having sustained issue three, we modify the judgment to provide that Cathy take nothing from American Religious Town Hall Meeting, Inc. As modified, we affirm the trial court's judgment.

Chief Justice Gray dissenting.

TOM GRAY, Chief Justice, dissenting.

Winters was a nurse employed by Town Hall Estates–Whitney, a nursing home. A resident alleged to Winters that a nurse assistant had caused the resident to touch the assistant's penis. Winters relayed the resident's allegation to Winters's supervisor. Thereafter, Winters was discharged. Winters sued Town Hall Estates and other defendants (collectively "Town Hall") for retaliatory discharge under Texas Health and Safety Code Section 242.133(b). *See* TEX. HEALTH & SAFETY CODE ANN. § 242.133(b) (Vernon 2001). Town Hall appeals. We should reverse.

In Town Hall's first issue, it contends that "Health and Safety Code § 242.133 does not apply to this case because [Winters] did not report an incident of abuse as contemplated by that law."[1] (Br. at 8.) In Town Hall's second issue, it contends that there was no evidence or factually insufficient evidence that Winters made a "report." Town Hall briefs its first and second issues together.

We understand Town Hall's first issue to contend that as a matter of law Winters's actions do not bring her within the whistleblower protections of Section 242.133. Town Hall first raised that argument in its motion for judgment notwithstanding the verdict. Citing *Gonzales v. Methodist Retirement Communities,* Town Hall argues that Winters did not report a violation of law as contemplated by Section 242.133. *See Gonzales v. Methodist Ret. Cmtys.,* 33 S.W.3d 882 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *cf. also Vaughn v. Sears Panhandle Ret.,* No. 07–03–0021–CV, 2003 WL 22769612, 2003 Tex. App. LEXIS 9994 (Tex.App.-Amarillo Nov.

---

1. Health and Safety Code Section 242.133 provides:

 An employee has a cause of action against an institution, or the owner or another employee of the institution, that suspends or terminates the employment of the person or otherwise disciplines or discriminates or retaliates against the employee for reporting to the employee's supervisor, an administrator of the institution, a state regulatory agency, or law enforcement agency a violation of law, including a violation of this chapter or a rule adopted under this chapter, or for initiating or cooperating in any investigation or proceeding of a governmental entity relating to care, services, or conditions at the institution.

 TEX. HEALTH & SAFETY CODE ANN. § 242.133(b); *see id.* § 242.002(6) (Vernon 2001) (defining "institution").

24, 2003, no pet.) (mem. op.) (appellee argued no report made). *Gonzales* interpreted a former version of Health and Safety Code Section 242.133, which provided a cause of action, in relevant part, for a person retaliated against for "reporting ... neglect ... to the person's supervisors." Act of June 20, 1997, 75th Leg., R.S., ch. 1159, art. 1, § 1.25, 1997 Tex. Gen. Laws 4363, 4376 (amended 1999) (current version at TEX. HEALTH & SAFETY CODE ANN. § 242.133(b)); *see Gonzales* at 883–84 & n. 1. Gonzales told her supervisor that a resident "had fallen from a geriatric chair." *Gonzales* at 883. The Fourteenth Court of Appeals held that Gonzales did not thus report "neglect" as that term was used in the statute. *Id.* at 885. Rather, Gonzales's and the supervisor's "discussion was not about the fall itself and that it happened, but about the resident's condition and how best to evaluate her condition." *Id.* at 885–86. Moreover, Gonzales did not use the word "neglect," and neglect could not be inferred from the resident's falling. *Id.*

Town Hall points to evidence that Winters only told her supervisor "that the patient informed her she had been abused," and "stated near the time, and at trial, that she did not believe any abuse had taken place." (Br. at 10.)

Winters does not dispute Town Hall's statement of the facts. Winters purports to distinguish *Gonzales,* rather, arguing that "what happened in *Gonzales* bears no resemblance to the facts of the present case": in *Gonzales,*

> [t]he employee admitted that she had not reported any abuse, nor did she think any had occurred. Also, in her conversation with the director of nurses, the employee did not mention abuse or neglect. The court of appeals applied the dictionary definition of "neglect" and held that the evidence did not support a claim that the employee had reported neglect, and the employee "never put [the medical director] on notice that, by calling him, she was reporting an act of neglect."

(*Id.* at 13 (quoting *Gonzales,* 33 S.W.3d at 886 (alteration in Winters Br.)) (internal citations omitted).) We understand Winters to draw the distinction that, while in *Gonzales* it was questionable whether the result that Gonzales described was caused by neglect, in Winters's case there is no doubt that if the resident's allegations were true the assistant's conduct constituted a violation of law.

Even Winters's statement of the facts of *Gonzales* points out the apt comparison with Winters's case. Winters did not report that a violation of law occurred, or that she believed one had; Winters only informed her supervisor that she felt it necessary to tell the supervisor that a resident had reported a violation, but that Winters did not believe the resident. Winters thus did not report to her supervisor that a violation of law had occurred. Accordingly, Winters does not establish a cause of action under Section 242.133. We should sustain Town Hall's first issue.

Having sustained Town Hall's first issue, without reaching Town Hall's other issues, we should reverse and render judgment that Winters take nothing.