Joan CAPPS, Appellant/Cross–Appellee,

v.

NEXION HEALTH AT SOUTHWOOD, INC. d/b/a Southwood Nursing and Rehabilitation Center, Appellee/Cross–Appellant.

No. 12–09–00393–CV.

Court of Appeals of Texas, Tyler.

Sept. 7, 2011.

Julie E. Johnson, Law Office of Julie Johnson, PLLC, Kirk L. Pittard, F. Leighton Durham III, Kelly, Durham & Pittard, LLP, Dallas, Cheyenne J. Robertson, for Appellant.

Bryan G. Rutherford, Gregory N. Ziegler, Macdonald Devin P.C., Dallas, for Appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## OPINION

BRIAN HOYLE, Justice.

Joan Capps brought suit against Nexion Health at Southwood, Inc. d/b/a Southwood Nursing and Rehabilitation Center (Southwood), Nexion Health Management, Inc. (NHM), and Nexion Health, Inc.[1] for retaliatory discharge. A jury found in favor of Capps, and the trial court's judg-

---

1. The claims against Nexion Health, Inc. were not presented to the jury, and the disposition of those claims is not at issue in this appeal.

ment awarded her $1,367,846.00, plus attorney's fees. Southwood raises six cross-issues concerning charge error, a purported damage cap in Capps's pleadings, and sufficiency of the evidence to support the jury's liability finding, the damage awards, and the attorney's fee award. Capps raises a single issue, contending that the trial court erred in failing to submit a jury question inquiring as to whether NHM was liable for wrongfully discharging Capps. Because there is legally insufficient evidence to support the trial court's award of $4,000.00 for medical bills, we render judgment that Capps take nothing on her claim for medical bills, if any, or her claim for lost employee benefits. The evidence supports submission of a jury question regarding the liability of NHM; therefore we reverse and remand this cause for a new trial.

## BACKGROUND

NHM manages nursing homes and, upon its acquisition, took over management of Southwood in November 2005. At that time, Southwood had numerous regulatory issues and outstanding deficiencies, known as tags, that were being monitored by the state. In July 2006, the Department of Aging and Disability Services notified Southwood that it did not meet state licensure requirements and was not in substantial compliance with federal requirements. That notice was accompanied by a lengthy report cataloging the deficiencies. Southwood was instructed to submit a plan of correction and fined $1,400.00 per day.

Administrators of the individual nursing homes managed by NHM report to Sherri Clark, NHM's regional director of operations. In late July 2006, Clark hired Capps as the newest administrator of Southwood. Capps wrote the required plan of correction, hired new permanent staff, and worked toward improving South-

wood. In mid-August, the state surveyor came back to the facility, cleared some deficiencies, wrote up some new deficiencies, and lowered the fine to $50.00 a day. All previously documented deficiencies were cleared in December 2006.

J.J. Devron was hired as Southwood's director of nurses in early or mid-February 2007. On Friday, February 23, 2007, a resident, A.J., was moved to Southwood's locked unit. On Saturday night, Capps was notified of an incident involving A.J. and a nurse's aide. The aide was suspended and an investigation ensued. A state surveyor, Clavion Hall, arrived at Southwood on Tuesday, February 27, for a surprise inspection due to an abuse allegation arising out of Saturday night's incident. During the inspector's investigation, some irregularities were discovered regarding the documentation supporting A.J.'s move to the locked unit. NHM and Capps initiated their own investigation.

Late in the afternoon on February 28, Clark set up a conference call with Capps, Cindy Hamm, NHM's human resources manager, and two corporate nurses, Denise Honnoll and Janet Johnston. Not long after the call began, Capps got upset and left the building. She later received a voice mail message from Clark telling her that her replacement would be there in the morning and she should make arrangements to pick up her things.

Capps sued Southwood, Nexion Health, Inc., and NHM for retaliatory discharge pursuant to Texas Health and Safety Code Section 242.133. TEX. HEALTH & SAFETY CODE ANN. § 242.133 (West 2010). The jury found in her favor, and the trial court's judgment awarded her $1,367,846.00, plus attorney's fees. On appeal, both Capps and Southwood complain of certain aspects of the judgment.

## LIABILITY

In part of its first cross-issue, Southwood asserts the trial court erred in overruling its motion for directed verdict because Capps did not prove by legally sufficient evidence that Southwood terminated her employment in retaliation for any action identified in Section 242.133. In its second cross-issue, Southwood contends the evidence is legally and factually insufficient to support the jury's finding that it is liable for retaliatory discharge. Southwood argues that Capps did not present legally sufficient evidence that she was terminated for any action protected by Section 242.133, that is, that she reported or investigated abuse or neglect. Further, Southwood argues that the jury's answer to question one is contrary to the great weight of the evidence because no reasonable juror could have formed a firm conviction disputing the evidence that Capps walked off the job. Additionally, Southwood argues that the great weight of the evidence shows that Capps, if terminated, was terminated for investigating a forged signature, which is not an action protected by Section 242.133. Thus, Southwood argues that Capps did not meet her burden to show that her protected activity caused her to be terminated.

### Standard of Review

■ A court properly instructs a verdict if no probative evidence raises a fact issue on the material questions in the suit. *Prudential Ins. Co. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.2000). A defendant establishes a right to a directed verdict when a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery or when the plaintiff admits, or the evidence conclusively establishes, a defense to the plaintiff's cause of action. *Id.* Thus, an appeal from the denial of a motion for directed verdict is essentially a legal sufficiency challenge. *Lochinvar Corp. v. Meyers*, 930 S.W.2d 182, 187 (Tex.App.-Dallas 1996, no pet.). A directed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled, as a matter of law, to judgment. *Willet v. Cole*, 249 S.W.3d 585, 590 (Tex.App.-Waco 2008, no pet.).

■ A party who challenges the legal sufficiency of the evidence to support an issue on which it did not have the burden of proof at trial must demonstrate on appeal that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). In reviewing for legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict, indulging every reasonable inference that would support it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005). To determine whether legally sufficient evidence supports a challenged finding of fact, the reviewing court must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.* Anything more than a scintilla of evidence is legally sufficient to support the finding. *See Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996).

■ If a party is attacking the factual sufficiency of the evidence to support an adverse finding on an issue on which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex.App.-Austin 1992, no writ). In addressing a factual sufficiency of the evidence challenge, an appellate

court must consider and weigh all of the evidence in a neutral light. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). The verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* However, this court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998).

### Applicable Law

Nursing homes are regulated by the state. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 242.001–.906 (West 2010). A nursing home resident has the right to be free from verbal, sexual, physical, and mental abuse, corporal punishment, and involuntary seclusion. 40 Tex. Admin. Code § 19.601(b) (2011) (Dept. of Aging & Disability Servs., Resident Behavior and Facility Practice). Each resident has the right to be free from any physical or chemical restraints imposed for purposes of discipline or convenience, and not required to treat the resident's medical symptoms. 40 Tex. Admin. Code § 19.601(a) (2011) (Dept. of Aging & Disability Servs., Resident Behavior and Facility Practice). A nursing home resident has a right to not be relocated within the institution except in accordance with standards adopted by the Department of Aging and Disability Services. TEX. HEALTH & SAFETY CODE ANN. § 242.501(15). A person who has cause to believe that the physical or mental health or welfare of a nursing home resident has been or may be adversely affected by abuse or neglect caused by another person shall report the abuse or neglect. *Id.* § 242.122(a). The facility must have evidence that all alleged violations are thoroughly investigated. 40 Tex. Admin. Code § 19.601(c)(3) (2011) (Dept. of Aging & Disability Servs., Resident Behavior and Facility Practice).

■■■■■ An employee of a nursing home has a cause of action against that institution if it terminates the employment of the person for reporting to the employee's supervisor or a state regulatory agency a violation of the law, including a violation of Chapter 242, or for initiating or cooperating in any investigation relating to care, services, or conditions at the institution. TEX. HEALTH & SAFETY CODE ANN. § 242.133(b). The employee has the burden of proof, but there is a rebuttable presumption that the person's employment was terminated for reporting abuse or neglect if the person is terminated within sixty days after the date on which the person reported in good faith. *Id.* § 242.133(f). Once the employer submits evidence that it would have taken adverse action in the absence of the report or investigation, the rebuttable presumption disappears and the plaintiff must submit evidence of causation. *Town Hall Estates–Whitney, Inc. v. Winters,* 220 S.W.3d 71, 81 (Tex.App.-Waco 2007, no pet.). The plaintiff must prove by a preponderance of the evidence that the defendants would not have terminated her employment when they did but for her report or investigation. *See id.* Causation may be established by either direct or circumstantial evidence and reasonable inferences from such evidence. *Id.* at 84.

### Reason for Termination

In her petition, Capps alleged that the defendants terminated her in retaliation for investigating an incident of possible patient abuse or neglect and correlating falsification of patient records. The jury's question number one inquired:

Did Nexion Health at Southwood, Inc. d/b/a Southwood Nursing & Rehabilitation Center discharge Joan Capps in retaliation because she reported abuse or neglect to a supervisor, state regulatory agency, a law enforcement agency or for initiating or cooperating in any investigation or proceeding of a governmental entity relating to the care, services, or conditions at Nexion Health at Southwood, Inc. d/b/a Southwood Nursing & Rehabilitation Center?

If, Nexion Health at Southwood, Inc. d/b/a Southwood Nursing & Rehabilitation Center and Nexion Health Management, Inc. submitted evidence that it terminated Joan Capps in the absence of her activity that was protected by law, Joan Capps must prove, by a preponderance of evidence, that she would not have been terminated but for reporting abuse or neglect to her supervisor, a state regulatory agency, a law enforcement agency or for initiating or cooperating in any investigation or proceeding of a governmental entity relating to the care, services, or conditions at Southwood Nursing & Rehabilitation Center.

Southwood argues that the jury's answer is not supported by the evidence because Capps testified that she believed she was terminated due to missing time clock punch forms or for investigating an allegedly forged signature on a patient transfer form. Further, the state investigator, Clavion Hall, testified that forging a signature on a transfer assessment form would not constitute abuse of a resident. Therefore, Southwood argues, Capps did not prove she was terminated for any action protected by Section 242.133.

### Evidence of Abuse

While the lone act of forging a signature on a transfer assessment form might not constitute abuse of a resident, we consider the entire circumstances. Residents in the residential unit at Southwood are free to go anywhere in that unit or outside. Residents in the secured unit must remain in a secured area and can only go outside with an attendant. Deborah Harris, assistant director of nurses at Southwood, explained that the secured unit is behind locked doors and residents can go in and out only with a staff member. It is secluded from the rest of the population, and residents on the secured unit cannot see the visitors coming and going as they can in the open section. Residents in the locked unit cannot freely participate in activities. Their freedom is severely restricted. Harris explained that the secured unit is where they place residents who have mental problems, who wander, who are at risk of hurting themselves or others, or who may leave the facility if staff is not watching. The resident must be assessed to determine if she belongs in the locked unit before placing her in that unit. There must be documentation to prove that the resident needs to go in that unit, and it must be discussed with the family. Usually, Devron, the director of nurses, would make the decision to send a resident to the locked unit, and either Devron or another nurse would do the assessment for the transfer. It was Devron's responsibility to make sure the paperwork was in place.

A.J. was a blind diabetic with kidney failure who required a wheelchair, but who was cognitively aware. She came to Southwood in mid-February and did not like being there. A.J. did not wander outside the facility and was not at risk for hurting herself or any other residents. On February 23, 2007, she was moved to Southwood's locked unit. On the night of Saturday, February 24, Devron called Capps to tell her that a nurse's aide had been overheard by one of A.J.'s family members cursing in the hall. An allegation was made that the aide said A.J. was

getting on her f-ing nerves. Capps understood that there was no patient involvement, and therefore the incident did not need to be reported to the state. However, the nurse's aide was suspended and they investigated. On that same evening, A.J. was screaming and very agitated. Her daughter picked her up that night and brought her back the following Monday.

Devron noted that, three days after A.J. was moved to the secured unit, A.J.'s daughter did not understand that her mother was to be moved to the secured unit. There was a doctor's order for A.J. to be in the locked unit, taken by phone. It indicates that the date ordered was February 23, 2007. But the phone order was signed on March 13, 2007.

Clavion Hall, social services surveyor for the Texas Department of Aging and Disability Services, testified by deposition. She did a survey at Southwood in February 2007 to investigate a complaint of verbal and physical abuse and failure to call in an allegation of abuse. Those complaints involved the cursing incident and the allegation that an aide threw A.J. on a bed. A.J. told Hall that a staff member had been rough with her and told her to shut up. Hall toured the facility and reviewed A.J.'s chart. The documentation for placing A.J. in the secured unit was not in her file, so Hall asked Devron about the forms. Hall asked Devron for the document reflecting consent to be placed in the locked unit, as well as the assessment form showing why A.J. had been placed in the locked unit. Accompanied by Hall, Devron looked in several places but could not find the forms. Hall returned to Southwood's conference room where she had been working. As a result of Hall's inquiry, Devron asked Harris for the policy for the secured unit. Harris said she was not sure about a policy, but she was aware that there are two forms that should be filled out. Harris gave Devron two blank forms. Harris followed Devron to a nurse's station and saw her put the forms down and write something on them. Fifteen minutes after Hall asked for the forms, Devron brought a document to Hall and said she had found the assessment. The form was signed by Devron and a nurse, D. Cobb. Hall felt that the assessment form had been filled out after the fact. Hall immediately sought out D. Cobb. When asked by Hall, Debbie Cobb denied having signed the document. The consent form, which should have been signed by a legal representative, was not signed. Additionally, Hall believed that Devron knew of the allegation of roughness, but did not report it.

Capps had a scheduled vacation day on Tuesday, February 27, but went to Southwood after receiving a phone call from Harris. Harris told her that Hall was in the building to do a surprise inspection due to an abuse allegation. Hall questioned Capps about the documentation for placing A.J. on the secured unit and told her she questioned the nurse's signature on the assessment form.

Capps then asked Harris to investigate. Harris asked Debbie Cobb, whose name appeared on A.J.'s assessment form, if she had filled out the form. Cobb, who had not been at Southwood on the day the form was supposedly signed, said she had not filled out the form or signed it. She wrote out a statement to that effect on February 27, which was admitted into evidence. Capps told Clark and two other NHM corporate employees, Denise Honnoll, a clinical specialist, and Cindy Hamm, NHM's human resources manager, about Hall's concerns by email at 4:10 p.m. on February 27. Clark told Capps to suspend Devron until they finished the investigation.

The first thing Capps did on Wednesday morning, February 28, was suspend Devron for falsifying the document and for possible abuse due to the transfer of A.J. Then, Capps called the state's hot line to report two additional allegations of abuse: that, on February 26, an aide slapped A.J. and stole her food and that, on February 24, a different aide threw her on the bed and told her to shut up.

Clark asked Honnoll and Johnston, two corporate nurses, employed by NHM, to go to Southwood on February 28 to investigate the various allegations and report back to her. According to Capps, they asked for Capps's file showing what she had given the state, took over her office, and then did not talk to her again until later that afternoon when she was told to participate in a conference call.

While at Southwood on February 28, Johnston and Honnoll asked Harris what happened. Harris told them she had spoken to Cobb and she, Harris, concluded that Devron had forged the document. Harris thought they did not believe that Cobb did not sign the form. Harris said they did not want to lose Devron because it is hard to find another director of nurses. Devron was suspended for only twelve hours.

At 1:13 p.m., Johnston sent an email to Clark, Meera Riner, NHM's vice president of operations, Hamm, and Honnoll summarizing their findings regarding the cursing incident, the forms for placing A.J. in the secured unit, A.J.'s allegation that she was thrown on the bed, and an allegation that an aide slapped a resident and stole her food. Under the category outcomes, she wrote that they found no concrete evidence that Devron filled out the assessment on February 27 instead of February 23 when A.J. was placed in the locked unit, and that both Capps and Devron were aware of an allegation of abuse on the evening of February 24. She closed the email by asking for instructions as to the next step they needed to take.

Harris testified that putting A.J. in a lock down unit when she did not meet the criteria is a form of neglect and abuse and constitutes punishment. On direct, Harris said she thought Capps was fired for participating in and facilitating this investigation. On cross examination, Harris said she thought Capps was fired for reporting a nurse forging a signature, not for reporting abuse or neglect.

Debbie Cobb, who had been a licensed vocational nurse at Southwood, explained that she had been responsible for A.J.'s day to day care. A.J. was not at risk of leaving the facility and was not a danger to herself or others. Cobb was not aware that A.J. was an Alzheimer's patient or had dementia. She believed that A.J. was alert and cognitive. Cobb testified that residents in the secured unit lose some of their freedom and, therefore, it would be abusive to put a resident in a locked down unit if she did not need to be there. She denied signing the form to place A.J. on the locked unit and was upset that someone had signed her name to it. She said that putting a resident in an area she does not deserve to be in is harmful to the resident. The only person she remembered talking to about the signature was Hall.

In her deposition testimony, Hall agreed that residents on the secured unit lose some of their freedoms because it is in their best interest and the facility's best interest. She explained that if a resident does not meet the requirements for the locked unit, it would be considered physical restraint. If a resident is cognitive enough, she is being held in a locked unit against her will, and the physician and family have not agreed to it, it is a restraint. She testified that a reasonable

person would feel deprived and that she is being punished if placed in the locked unit in the absence of proper procedure.

Hall was asked to read the Texas Administrative Code definition of mental and psychological abuse, which includes humiliation, harassment, threats of punishment, deprivation, or intimidation. She agreed that a reasonable person who has been placed on a secured unit, and should not have been, could be suffering mental abuse per that definition.

On cross examination, Hall said forging a name on an assessment form alone would not constitute abuse of a resident. She also said that saying a resident tries to leave the facility when she had not would not be abuse. Hall explained that filling out the form incorrectly would not necessarily be abuse, although it could be a clinical records issue. She also explained that if the resident was on the unit without the required criteria, it would have been a physical restraint deficiency, and involuntary seclusion could be a deficiency. Hall said that placing a resident in a unit against her will, by itself, would not be abuse, although it may be a deficient practice. She testified that the only way it could be abuse is if they physically forced her to be on that unit.

Regarding procedure for placing a resident in the locked unit, Capps testified that if incorrect information is on the assessment form, the signature on the assessment form is falsified, and a resident is transferred to a locked unit when it is not appropriate for that person, it could be abuse or neglect. She said it could be restraint or could implicate the resident's psychosocial well being or her care. She conceded that the falsified signature itself did not constitute abuse or neglect of a resident. Capps explained that the form is an issue because the information on it is totally fake. When asked if this was an abuse situation, Capps responded that she was investigating, indicating that she had to investigate in order to determine if there was any abuse involved.

Sherri Clark did not tell Capps to report the possible falsification because she did not think it met the requirements for abuse, neglect, or misappropriation of property and was therefore not a reportable. Clark and Capps never discussed whether there was any need to report the falsification issue. Clark testified that they were investigating a potential forgery, not whether the resident was appropriate for the locked unit. She testified that it had never come to her attention that the resident was inappropriate and that was not an issue at the time. However, the record includes an email from Meera Riner to Clark, sent at 10:54 a.m. on Tuesday, February 27, stating:

State at swood-complaint

Issue with them putting a res on secured unit this w/e State wanting sec unit policy Told denise that we just need to refer to criteria My worry was also that denise made a comment about aide said bad word in hearing of resident? ? ?

Can u call—iam scared

Clark testified that the fact that the special care unit consent form was not filled out did not change her opinion about whether the forms presented an abuse issue. She explained that filling out the forms is part of the process for placing someone on the locked unit pursuant to their policy. That process has nothing to do with whether there was a forgery. Thus, filling out the forms incorrectly does not constitute abuse of a resident. Furthermore, Clark explained, a doctor's order is not absolutely required to transfer a patient into the unit. Or, they could transfer a patient based on nothing other than a doctor's order. Clark opined that being in

the locked unit is not in and of itself abusive.

Denise Honnoll is employed by NHM as a regional clinical specialist. She helped investigate the alleged abuse and document falsification. She testified that they were unable to determine if the signature had been falsified because they were unable to speak to Cobb. Honnoll testified that the signature issue was not one required to be reported to the state and that placing a resident in the secured unit who did not belong in the secured unit would not be abuse. A portion of Honnoll's deposition testimony was read into the record in which she stated that if someone is physically forced to be in the secured unit, then it is abuse and reportable. Also in her deposition, she stated that if anyone was not appropriate to be on a special care unit or a secured unit and they were put there, then that would be an allegation of abuse. On redirect, she explained that she would consider a person to be abused if they were actually physically forced to be there. If they were ... inappropriate to be there but were put there anyway and were secluded from other residents and into their room, then that possibly could. She then elaborated, saying, if they were actually taken and placed in there against their will knowingly, that they were—they were knowingly and willfully put in there against their will and they were able to say that they did not want to be in there. She testified that A.J. never indicated to anyone that she had an issue with being placed on the secured unit.

NHM's policy on abuse and neglect was introduced into evidence. It provides that [t]he facility will prohibit neglect, mental or physical abuse, including involuntary seclusion and the misappropriation of property or finances of residents. Abuse is defined as the willful infliction of injury, withholding or misappropriating property or money, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish. The policy also provides that [m]ental abuse includes but is not limited to, humiliation, harassment, and threats of punishment or depravation. The policy listed examples of verbal and mental abuse including, but not limited to, cursing, yelling, saying things to frighten a resident, denying food or care, isolating a resident.

### Discussion—Abuse

■ Harris and Cobb testified that it is abusive to put a resident in the locked unit when she did not meet the criteria for being there. Some witnesses recognized that whether being on the locked unit is abuse might depend on the circumstances. Hall testified that placing a resident in a unit against her will by itself is not abuse unless she was physically forced on to that unit. In her deposition testimony, Honnoll stated that it would be abuse to put someone in the special care unit who did not belong. At trial, Honnoll explained that physically forcing a resident to be on the secured unit is abuse, and placing a resident on the secured unit who is inappropriate for the unit and secluding her there could be abuse. Hall explained that placing a resident on the secured unit when she does not meet the requirements for that unit would result in a physical restraint tag. Further, she stated that involuntary seclusion is a deficiency. Hall testified that the resident would feel deprived and punished. Harris also testified that placing a resident on the secured unit who does not qualify to be there constitutes punishment. Hall agreed that the resident would be suffering mental abuse as defined in the Texas Administrative Code. Capps testified that the combination of incorrect information on the assessment form, a falsified signature, and the transfer of a resident to the locked unit who was not appro-

priate for that unit could be abuse, neglect, or restraint, and could implicate the resident's psychosocial well being or her care.

The statute required Capps to report if she had cause to believe that a resident's physical or mental health or welfare has been or *may be* adversely affected by abuse. *See* TEX. HEALTH & SAFETY CODE ANN. § 242.122. The facility is required to investigate all alleged violations. It is conceivable that placing a resident on the secured unit when she did not qualify for that unit could have been humiliating, or could have involved harassment, threats of punishment, deprivation, or intimidation, all of which constitute abuse. *See* 40 Tex. Admin. Code § 19.101(1)(B) (2011) (Tex. Dept. of Aging & Disability Servs., Definitions). Additionally, this act could have constituted involuntary seclusion or restraint. *See* 40 Tex. Admin. Code § 19.601(a), (b). Or, it could have been unreasonable confinement, a type of abuse as defined by Nexion's policy.

The evidence supports Capps's determination that the situation warranted an investigation into possible abuse. It is irrelevant for our purposes that the investigation may have been inconclusive as to abuse allegations. Further, Capps was terminated before the investigation was completed, so a later determination by NHM or Southwood that there was no abuse would not be a factor to consider. There is more than a scintilla of evidence showing Capps reported and was investigating abuse or neglect, actions that are protected by Section 242.133. *See* TEX. HEALTH & SAFETY CODE ANN. § 242.133. Thus, to the extent Southwood's motion for instructed verdict complained that, as a matter of law, Capps was not engaged in an activity protected by Section 242.133, the trial court did not abuse its discretion in denying the motion. *See Prudential Ins. Co.*, 29 S.W.3d at 77.

Further, the evidence is legally sufficient to support the jury's finding that Capps was engaged in an activity protected by Section 242.133. *See Cazarez*, 937 S.W.2d at 450.

Four witnesses, Hall, Capps, Clark, and Honnoll, agreed that a falsified signature on the assessment form is not by itself abuse. However, an assessment was supposed to have been done and placed in A.J.'s record. *See* 40 Tex. Admin. Code § 19.801 (2011) (Dept. of Aging & Disability Servs., Resident Assessment). The irregular circumstances of A.J.'s assessment form were an indication that there could be a problem, including abuse. Hall points out that filling out the form incorrectly is not necessarily abuse, while Clark testified that improperly filled out forms do not constitute abuse. Harris explained that the secured unit is secluded from the rest of the population of Southwood. Harris, Cobb, and Hall noted that secured unit residents have restricted freedom. Of course, as Clark pointed out, being in the locked unit is not in and of itself abusive. At trial, just before saying that forcing someone to be in the secured unit when she does not belong would be abuse, Honnoll stated that it is not abuse to place a resident in the secured unit who did not belong there. It was within the jury's province to resolve conflicts in the evidence. *See City of Keller*, 168 S.W.3d at 819.

Considering all of the evidence, the jury could have found that Capps was investigating whether A.J.'s placement in the secured unit was abuse and that her consideration of the forgery issue was merely a part of that investigation. The verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. The evidence is factually sufficient to support the jury's finding that Capps

was reporting or investigating abuse or neglect.

### Evidence of Termination

Southwood also contends that Capps was not terminated, but quit her job, and therefore the evidence is insufficient to support the jury's finding. We disagree. Harris testified that, after the conference call, Capps came to her office and said that they were thinking Capps had done something wrong. Capps told her she was tired, had been there all day, and that she was going home. She also said she would see Harris the next day. Capps did not say anything to Harris suggesting that she was quitting. Harris testified that before she left work that day, the rumor had surfaced that Capps had been terminated. Harris did not think Capps had abandoned her job.

Capps explained that, on Wednesday, February 28, after Honnoll told her that Devron did not falsify the document, Capps told Honnoll that she knew Devron falsified the document and she was not going to work in a facility where that is allowed. On the conference call, Johnston accused Capps of threatening to quit if they did not find Devron guilty and Capps called her a liar. At that point, Capps was upset, frustrated, and confused. She asked if they were attacking her. She testified that she told Clark, I've been here since 6:30 this morning, I had no lunch, I'm tired, I haven't been able to do my investigation, and I need to go home. Clark did not say anything in response. Capps testified that she then said, Sherri, I need to go home before I say something I'll regret, and she said, go home, Joan. Capps said she left, but she did not quit. After leaving the facility, Capps went to her bank for a 5:00 appointment. While at the bank she noticed her phone ring, but she did not answer. When she got back to her car, she checked her messages. Clark had left her a message telling her she did it this time, not to come back, that she could make arrangements to get her things, and Martha Riner, her replacement, would be at Southwood the next morning.

The following morning, Capps sent an email to Fran Kirley, the owner and CEO of Nexion,[2] explaining that Clark had terminated her the day before. She described the events of the week and declared her termination the biggest gang-up, back stabbing cover-up she had ever witnessed. Capps also sent an email, date unknown, to Clark in which Capps told her that leaving a voicemail to terminate is inappropriate, unprofessional, and weak.

Clark testified about a time in November 2006 when there were issues that needed to be addressed and Capps got upset and said, I just give up ... I can't do it anymore. Clark also testified that Capps had told the regional nurse that she was quitting in December 2006 because she was frustrated with everything. Clark felt then that Capps was angry that other corporate employees were pointing out problems at Southwood. Clark said Capps got frustrated and took it personally when other people were in her business. Clark said she tried to calm Capps down.

In an email sent to Meera Riner on February 27 at 3:24 p.m., Clark called Capps an idiot because of the way she was handling the investigation and because she was not reporting allegations to the state. At 4:10 on February 27, Capps sent a summary of the facts to Clark. Clark responded that they should have reported the allegation of abuse. At trial, Clark said that it did not matter to her what

2. Capps testified that Kirley is the owner of Nexion and I guess he's the chief executive officer. It is unclear whether that reference is to NHM, Nexion Health, Inc., or both.

Capps's summary said because she was not sure she was going to get the straight story from Capps. She had already made the decision to get other people in the facility to get it figured out.

Clark described the conference call, saying they were going through Johnston's summary of the investigation, and Capps loses it and started complaining about Johnston being a troublemaker. Clark explained,

And you know, I'm trying to say, you know, Joan, let's not do this. And then she says, you know what, I just need to leave and—and whatever. And then you know, I'm like—then I—I'm getting angry because she's blasting Janet and Janet is there trying to help. And so I'm saying, you know what, you—you could just leave with it.

Clark thought Capps did not want Johnston in her business and wanted it to just be her way. At some point, Clark lost her phone connection and when she called back, she was told that Capps was gone. Clark testified that she thought Capps had quit, and Clark thought that was probably a good thing. Clark explained that when she told Capps she could leave, she meant leave and do not come back. Clark immediately made arrangements for Martha Riner, an interim administrator who works for NHM, to be at Southwood the next morning.

Clark testified that after arranging for Martha Riner to come in, Harris called Clark to ask about what was going on. Harris told her Capps had just left for the day and she would be coming back. Clark then called Meera Riner back and said, apparently, she thinks she can come back after acting that way. And so I said, you know, I think I'm going to have to call her and—because I don't want her coming back and now I've made arrangements for Martha to be there, and we just need to move forward. Clark explained that she then thought, [Capps] can't come back in the building. So, Clark called Capps's cell phone number again and left a message saying, [Y]ou know, Joan, I understand you're planning on coming back to the building, and you don't need to come back. You can make arrangements to get your stuff later.

On cross examination, Clark said Capps's separation had nothing to do with the investigation. Clark stated unequivocally that she did not terminate Capps. She said Capps resigned.

On the morning of March 8, Hamm sent an email to Meera Riner stating:

I need to terminate Joan. Based on the situation, I am not sure which direction to go. I have spoken to Sherri and determined exactly what happened later that evening related to Joan walking out.... [D]uring the fact finding call with the regional team, she was inappropriate and said she was leaving, took off her badge and threw it on the desk and she left. She did not leave her keys. Later, Deborah Harris, ADON was talking to Sherri and threw [sic] the conversation it was mentioned that Deborah had spoken to Joan and it was perceived that Joan would be back the next morning. Sherri called Joan a couple of times and could not reach her. She finally left a message for her that indicated she should not return the next day, Martha would be at the facility the next day and she could arrange a time to pick up her belongings.

So, do we consider that she walked off the job or do we terminate. After speaking with Sherri today, it really doesn't appear that she walked off the job and did not plan to return. Joan is definitely telling people that she was terminated.

If we terminate, how about: Inappropriate/Unprofessional Conduct and leaving the facility during a conference call with the Regional Team.

Let me know what you think.

The following day, Meera Riner responded with the following:

I like the inappro conduct thing.

hey look-we let her go and saved ourselves three damn tags

Later on March 9, Hamm sent an email to the woman who handles the payroll at Southwood:

Below is the information to use for Joan's terminations.

Term–Inappropriate/Unprofessional Conduct and leaving the facility during a conference call with the Regional Team.

Clark sent an email to Meera Riner and Hamm, dated March 20, 2007, subject: JOAN STATEMENT. In it, Clark explained her recollection of the events leading to Capps's departure. Clark said that Capps had told her that she could not work with someone who was dishonest. In the email, Clark said that during the conference call, Capps became irate, complained that Johnston constantly causes problems, and said she did not have to sit there and be attacked so she was leaving. Clark said she broke in and told Capps she could not talk to support members that way and she could leave. Clark said in the email that everyone on the conference call was under the impression that Capps had abandoned her job and quit. Clark explained that, ten minutes later, Harris called her and told her that Capps was planning on coming back to work. Clark realized that Capps had thought she could act like that and come back to work. So Clark attempted to call Capps, who did not answer. Clark left her a message saying she did not need to return and she could make arrangements to get her stuff.

At trial, Capps described the entire narrative in Clark's email as totally bogus and stated that none of it occurred. She specifically denied ever telling Clark that she could not work with someone who was dishonest. Capps also testified that Clark's statement that Capps had said she did not have to sit there and be attacked so she was leaving was a lie.

Honnoll testified that, during the conference call, she was with Capps in Capps's office. They started going through Johnston's investigation summary, and Capps became upset. Honnoll testified that Capps muted the phone and slammed her hands on the desk. She said Capps threw her name tag down, grabbed some things and put them in her purse, and Capps said, I've got to go, I've just got to get out of here now.

Honnoll's undated statement describing what happened on February 28 was admitted into evidence. In it, she stated that while Hamm spoke, Capps shook her head and slammed her hands on the desk, pushing the mute button on the phone before she did so. She said that Capps stated that Johnston causes things to get screwed up. Honnoll said Capps stood, started slamming things around, had a very angry look on her face, ripped off her name tag, grabbed her purse, and shoved things into it. Honnoll said that Capps said, I've got to go, I've just got to get out of here now. Honnoll said that Capps's face was red and she was crying, and then she exited the office.

Johnston testified that, on the morning of February 28, Capps slammed down on the desk and said I know [Devron] did it and if you don't find her guilty, I'm not working for somebody who lets somebody do that. Johnston testified that, on the conference call, Capps said Johnston caused trouble and then Clark tried to get Capps back on track. Johnston said, And

the next thing was when Joan walked out of the office with items in her hands. She was out the door. Johnston said Capps pulled the door shut very hard and said, I'm out of here, and left. Johnston took it that she quit because she left. Johnston said she could hear the sounds of pounding on the desk and hands hitting the desk coming across the phone.

Johnston sent an email to Hamm and Clark, dated March 23, 2007, subject: statement Joan. In it, Johnston described her version of the conference call. She said that Capps became very upset, raised her voice, slammed things on her desk, and commented that's not the way it happened. Johnston said Clark attempted to stop her, but Capps continued on until she left the building.

At trial, Capps said she did not remember pushing the mute button. But if she had, then Johnston would not have been able to hear her slam things on her desk since she was in a different office at Southwood during the conference call. Capps testified that she did not remember having a name tag or stuffing things in her purse. Capps said she did not agree with Honnoll's or Johnston's statement.

### Discussion—Termination

 There was evidence that Capps had been frustrated and threatened to quit in the past. Further, Clark and Johnston testified that they thought Capps quit. Clark specifically denied terminating Capps. However, there was a great deal of evidence to the contrary. On February 27, Clark already felt that Capps would not sufficiently handle the investigation and decided to send Honnoll and Johnston to take over. On February 28, Capps said she was upset and needed to leave. Honnoll's testimony was similar on this point and consistent with a finding that Capps did not quit. Honnoll was the only eyewitness to Capps's behavior leading up to her departure. Capps told Harris she would be back the next day, which is inconsistent with the intent to quit. While on the conference call, Capps denied having threatened to quit that day. During the call, Clark told Capps to leave and, at the time, she meant that Capps should not come back. Shortly after Capps left, Harris told Clark that Capps did not intend to quit. Clark's response was to call Capps and tell her she did not want her to come back and then to immediately contact Capps's replacement. Further, the jury was entitled to believe Capps regarding the conflicting testimony about the name tag and whether she put things in her purse. See Ellis, 971 S.W.2d at 407. Significantly, Hamm conceded that it did not appear that Capps walked off the job with no intention to return. Finally, Hamm and Meera Riner agreed to say they terminated Capps, although they did not admit to violating the statute. Considering all the evidence, the jury's finding that Capps did not quit, but was terminated, is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See Cain, 709 S.W.2d at 176.

### Causation

 Finally, we consider whether Capps proved by a preponderance of the evidence that Southwood would not have terminated her but for her report or investigation. See Winters, 220 S.W.3d at 81. We conclude that she did.

Southwood asserts that Capps testified that she was terminated because of a problem with missed punch forms. The record does not bear this out. Capps explained that a Southwood employee had missed a day of work to cater Capps's wedding.[3]

---

3. In Clark's version, the employee was cleaning Capps's house.

Clark brought it to Capps's attention that the employee had filled out a missed punch form indicating that, although she had not punched the time clock that day, she had worked that day. Capps testified that she had thought the employee had taken a vacation day and was unaware that she had filled out the missed punch form. Capps was never reprimanded for this incident. Capps learned that Johnston and Honnoll had asked staff members about missed punch forms during their investigation. Capps also testified that, on the conference call, Hamm asked her about a missed punch form of another employee. However, there is no evidence that Capps was terminated due to any problem associated with the missed punch forms, or that she thought she had been. In fact, Capps testified that she was terminated for investigating A.J.'s transfer to the locked unit.

The record shows that A.J. did not meet the usual criteria for placement in the locked unit. Further, there was a discrepancy between the date of placement and the date of the doctor's order. It was Devron who moved A.J. to the secured unit. Harris saw Devron with the blank forms. Cobb was not in the building. Fifteen minutes later, Devron gave the forms, which had been filled out and signed by D. Cobb, to Hall. When asked by Hall, Cobb denied having signed the form and provided a written statement reiterating that she did not sign it. Reasonable jurors could infer that her signature was forged by someone and that A.J. was not properly placed in the secured unit. Considerable evidence pointed to Devron.

On the day of their investigation, Johnston and Honnoll appeared to give no credence to Cobb's assertion that she did not sign the form. In her February 28 summary, Johnston stated they could not find concrete evidence that Devron wrote the assessment on February 27 instead of February 23. However, even though the alleged forgery was one of the topics Johnston and Honnoll were sent to investigate, Johnston's summary mentioned neither the allegation of forgery, nor Cobb's name. They were unable to speak directly to Cobb that day, and they did not see, or ask for, her handwritten statement. Furthermore, Cobb testified that no one tried to contact her later about whether the signature on the form was hers.

Devron was at the facility while the investigation took place. At least part of the day on February 28, Devron was in Capps's office with Johnston and Honnoll. The investigation ended without interviewing a key witness. And Devron was brought back to work after just a twelve hour suspension.

Harris testified that this incident occurred just two or three weeks after Devron began working as Southwood's director of nurses. According to Harris, they were afraid to lose the director of nurses because it is hard to find another. Capps said it is harder to find a new director of nurses than to replace Capps. After all, Capps's replacement already worked for NHM. Had Capps continued her investigation and found that Devron forged Cobb's signature on the assessment form and inappropriately placed A.J. in the locked unit, she would have fired Devron. By terminating Capps, NHM and Southwood avoided losing their director of nurses.

Hall testified that if a resident is on the locked unit without the required criteria, the facility would get tagged. NHM and Southwood definitely wanted to avoid new tags. The jury could have determined that Clark wanted Johnston and Honnoll to derail Capps's investigation so Southwood would avoid getting tagged for inappropriately placing a resident in the locked unit, potentially a form of abuse. On the

conference call, Johnston accused Capps of saying she would quit if they did not find Devron guilty of forgery. The jury could have believed that NHM and Southwood thought that Capps would quit if Devron was not found guilty of forgery and that they wanted her to quit. Significantly, the jury could have believed that, when it became clear that Capps would not drop the issue or quit, Clark determined that terminating Capps would be the best course of action. As Meera Riner said in her March 9 email, we let her go and saved ourselves three damn tags.

Viewing all of the evidence in the light most favorable to the verdict, indulging every reasonable inference in favor of the verdict, we conclude that the evidence of causation, including circumstantial evidence, is more than a scintilla. *See City of Keller,* 168 S.W.3d at 822. There is some evidence from which reasonable jurors could draw a reasonable and logical inference that NHM and Southwood terminated Capps for reporting and investigating whether A.J. was appropriately placed in the locked unit because they did not like the possible outcomes of her investigation, that is, being tagged by the state and losing their director of nurses. The evidence rises to a level that would enable reasonable and fair minded people to differ in their conclusions. *See Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we conclude that the evidence is legally sufficient to support the jury's finding that Capps's employment would not have been terminated but for her report and investigation regarding the appropriateness of placing A.J. in a locked unit. *See City of Keller,* 168 S.W.3d at 830. We overrule the portion of Southwood's first cross-issue complaining that the trial court abused its

discretion in denying Southwood's motion for directed verdict.

The jury was entitled to resolve inconsistencies and conflicts in evidence, and we must accept the jury's resolution of these inconsistencies and conflicts. *See id.* at 819–20. In doing so, the jury could have disregarded Honnoll's testimony that they could not determine if the signature on the form was Cobb's, Johnston's testimony that she took Cobb's statement as true, and Clark's statement that, although there was something fishy about the document, they could not prove what happened and the investigation was inconclusive. Likewise, Clark's denial that A.J.'s appropriateness for the locked unit was an issue at all could have been disregarded by the jury. Viewing all the evidence in a neutral light, we conclude that it is factually sufficient to support the jury's finding on the issue of causation. The jury's finding that Capps would not have been terminated but for reporting abuse or investigating issues related to the care, services, or conditions at Southwood is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain,* 709 S.W.2d at 176; *Winters,* 220 S.W.3d at 81. We overrule Southwood's second cross-issue.

## JURY CHARGE

In its first cross-issue, Southwood asserts the trial court abused its discretion by submitting a liability question to the jury that was not predicated on a jury finding of the required elements under the Texas whistleblower statute. Southwood argues that the question as submitted improperly assumed that Southwood discharged Capps and therefore constituted an improper comment on the weight of the evidence. Southwood also argues that the question was improperly submitted because it should have been predicated on a

finding that Capps engaged in protected activity.

### Applicable Law

■■■ The standard of review for alleged jury charge error is abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990) (op. on reh'g). The rules of civil procedure require the trial court to submit the cause upon broad form questions when feasible and to submit such instructions and definitions as shall be proper to enable the jury to render a verdict. TEX.R. CIV. P. 277. The goal of the charge is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex.1999). The trial court is afforded broad discretion so long as the charge is legally correct. *Id.*

### Discussion

■■■ Southwood requested three separate questions asking in turn if the jury found that Capps proved that (1) she reported or investigated a violation of the law pursuant to Chapter 242, (2) Southwood terminated her employment, and (3) Southwood terminated her employment because of her report or investigation. The trial court denied the requested questions. Instead, the trial court submitted a single question:

> Did Nexion Health at Southwood, Inc. d/b/a Southwood Nursing & Rehabilitation Center discharge Joan Capps in retaliation because she reported abuse or neglect to a supervisor, state regulatory agency, a law enforcement agency or for initiating or cooperating in any investigation or proceeding of a government entity relating to the care, services, or conditions at Nexion Health at Southwood, Inc. d/b/a Southwood Nursing & Rehabilitation Center?

■■■ By way of analogy, we consider the jury question to be used in a case alleging a violation of the Texas Whistleblower Act. *See* TEX. GOV'T CODE ANN. §§ 554.002–.003 (West 2004). The Texas Whistleblower Act protects public employees from retaliation by their employer when, in good faith, employees report violations of the law. *See Rogers v. City of Fort Worth*, 89 S.W.3d 265, 274 (Tex.App.-Fort Worth 2002, no pet.). The approved jury question simply asks, was the employee's report made in good faith and a cause of the employer's terminating the employee when it did? *See* TEXAS PATTERN JURY CHARGES: BUSINESS, CONSUMER, EMPLOYMENT ch. 107.4 (Committee on Pattern Jury Charges of the State Bar of Texas 2000). The single question encompassing all elements complies with the mandate of Rule 277. In contrast, Southwood's requested questions separate the individual elements of the cause of action into distinct questions.

■■■ As a general rule, when a statutory cause of action is submitted, the charge should track the language of the provision as closely as possible. *Borneman v. Steak & Ale of Tex., Inc.*, 22 S.W.3d 411, 413 (Tex.2000) (per curiam). Question number one, as given, reflects the language of Section 242.133, which states that an employee has a cause of action against an institution that retaliates against the employee for reporting a violation of law or for initiating or cooperating in any investigation or proceeding of a governmental entity relating to care, services, or conditions at the institution. *See* TEX. HEALTH & SAFETY CODE ANN. § 242.133. The question was presented in broad form format and accompanied by an instruction clarifying Capps's burden of proof on causation. *See* TEX.R. CIV. P. 277. We conclude that question number one presents the elements of the cause of action logically, clearly, correctly, and com-

pletely. *See Hyundai Motor Co.*, 995 S.W.2d at 664. Thus, the trial court did not abuse its discretion in submitting question number one. We overrule the portion of Southwood's first cross-issue complaining that question number one was not properly submitted.

### JURY QUESTION ON NHM'S LIABILITY

▆ In her sole issue, Capps contends the trial court abused its discretion by not submitting a jury question inquiring whether NHM discharged her for retaliatory purposes. She argues that, in addition to Southwood, NHM was responsible for terminating her. Southwood and NHM acknowledged that the appellate record fairly raises the issue of NHM's liability. Further, Southwood and NHM agree that, unless this court determines that rendition in Southwood's favor is required, the judgment should be reversed due to the trial court's failure to submit the question of liability of both Southwood and NHM to the jury.

In her petition, Capps alleged that Southwood, Nexion Health, Inc., and NHM violated Section 242.133. The evidence showed that Clark was employed by NHM as regional director of operations. Clark hired Capps and was Capps's supervisor. Clark scolded Capps when Clark learned that a Southwood employee claimed to be working at Southwood on a day when she was doing personal work for Capps. Clark instructed Capps that she is not the boss and Clark would not tolerate Capps doing this stuff. On February 28, Clark called Capps and told her not to return to Southwood. No one ever questioned whether Clark had the authority to terminate Capps. Thus, the evidence showed that Clark acted on behalf of her employer, NHM.

Capps asked for a jury question inquiring if NHM discharged her in retaliation for reporting abuse or neglect or for initiating or cooperating in an investigation relating to the care, services, or conditions at Southwood. The trial court denied the request.

Because the issue of NHM's liability for violation of Section 242.133 was raised by both Capps's pleadings and her evidence, the trial court should have submitted the requested question. TEX.R. CIV. P. 278; *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex.2002). The trial court's refusal to submit the question is reversible error. *Sw. Bell Tel. Co. v. Thomas*, 554 S.W.2d 672, 674 (Tex.1977) (op. on reh'g). We sustain Capps's sole issue.

### DAMAGES

In its third cross-issue, Southwood asserts that the jury's answer to question two is not supported by legally or factually sufficient evidence. In response to question two, the jury awarded Capps $28,846.00 for lost wages, $4,000.00 for lost employee benefits, and $1,335,000.00 for past compensatory damages. Because we have already determined that the trial court committed charge error requiring a retrial of the case, we address only whether there is legally sufficient evidence of damages. *See* TEX.R.APP. P. 47.1. So long as there is legally sufficient evidence of some damages, the amount will be determined upon retrial.

### *Legal Sufficiency*

▆ Capps made $75,000.00 annually while working as administrator at Southwood. She was fired on February 28, 2007. For four months, her attempts to find a job were unsuccessful. She took a three week temporary job in July and then obtained a permanent position at the end of July 2007. Additionally, she received $5,642.00 in workers' compensation benefits between March 10, 2007, and July 17,

2007. Thus, there is some evidence that she is entitled to some amount in lost wages after having been wrongfully terminated. The evidence is legally sufficient to support the award. *See Cazarez,* 937 S.W.2d at 450.

■ The jury awarded Capps $4,000.00 for lost employee benefits while the judgment awarded her $4,000.00 for medical bills. At the hearing on Southwood's motion for judgment notwithstanding the verdict, Southwood suggested that the term medical bills in the judgment might be a typographical error. Without addressing that contention, Capps asserted that the $4,000.00 compensates her for the medical insurance she lost as a result of the termination. However, the record supports neither an award for medical bills nor one for employee benefits. The evidence showed that Capps used the $4,000.00 she had saved in a 401(k) account to cover her expenses during the time she was unemployed. There was no evidence that she accrued $4,000.00 in medical bills or that she lost $4,000.00 in employee benefits of any kind. Thus, the evidence is legally insufficient to support the trial court's $4,000.00 award. *See Croucher,* 660 S.W.2d at 58.

■ A mental anguish award must be supported by evidence of the nature, duration, or severity of the anguish, thus establishing a substantial disruption in the plaintiff's daily routine, or other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Saenz v. Fidelity & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996). Capps testified that after being terminated she had no income and no health insurance. She said the situation was very, very humiliating. Although she had many years of experience and she could get interviews, she was unable to obtain a job because of rumors, including rumors that she was accused of stealing. She was paranoid due to the rumors and did not want to go anywhere. She said she did not go out of the house very much and she stopped engaging in social activities altogether. To obtain permanent employment, she had to move out of state, away from her family, at a time when her father suffered from a terminal illness. She and her husband almost lost their house due to loss of income; then they had to make double house payments once she found the job in Missouri. Her husband moved to Missouri with her, but he had to return to East Texas to manage his business when it began to fail in his absence. There was a lot of strain between Capps and her husband, and they filed for divorce. She testified that she experienced a lot of anger. She explained that she was very depressed and did not sleep very much. Also, she gained forty pounds. She was not able to obtain employment in Texas until the summer of 2009, not long before the trial began. She testified that she cried a lot and that she was not her normal self. She explained that the situation remains very frustrating because she has never been told why she was fired and they did not respect her enough to talk to her about it. At the time of trial, more than two years after her termination, she had difficulty talking about it. Additionally, Harris described Capps as a total wreck after she was terminated. She elaborated, explaining that it was as if Capps's whole world had come to an end.

■ Accordingly, the record shows that there was more than a scintilla of evidence for the jury to conclude that Capps suffered compensable mental anguish. *See W. Telemarketing Corp. Outbound v. McClure,* 225 S.W.3d 658, 670 (Tex.App.-El Paso 2006, pet. granted, judgm't vacated w.r.m.). Further, wrong-

doing that threatens a person's reputation is sufficient to support an inference that the resulting injury was accompanied by mental anguish. *See Rogers v. City of Fort Worth,* 89 S.W.3d 265, 284 (Tex.App.-Fort Worth 2002, no pet.). Thus, the evidence is legally sufficient to support the award for past compensatory damages. *See Croucher,* 660 S.W.2d at 58.

Because there is no evidence to support the $4,000.00 award for lost employee benefits or medical bills, we sustain Southwood's third cross-issue to the extent it complains of this award. We overrule Southwood's third cross-issue to the extent it complains of the legal sufficiency of the evidence to support the awards for lost wages and past compensatory damages.

#### CONCLUSION

The trial court did not abuse its discretion in denying Southwood's motion for directed verdict. The jury's determination that Southwood discharged Capps in violation of Texas Health and Safety Code Section 242.133 is supported by legally and factually sufficient evidence. The trial court did not err in its submission of the liability question as to Southwood. However, the trial court abused its discretion in denying Capps's requested question on the liability of NHM for wrongful discharge under Section 242.133. There is legally sufficient evidence to support the awards for lost wages and past compensatory damages. Because there is legally insufficient evidence to support the $4,000.00 award, we *render* judgment that Capps take nothing on her claim for medical bills, if any, or her claim for lost employee benefits. We *reverse* the remainder of the trial court's judgment and *remand* the cause for a new trial. Due to our disposition of Southwood's third cross-issue and the issue of submission of NHM's liability to the jury, we need not reach Southwood's

complaints that the evidence is factually insufficient to support the damage awards, that a portion of the compensatory damages awarded should be remitted, and that the judgment should be modified to conform to the pleadings. *See* TEX.R.APP. P. 47.1. Finally, Southwood withdrew its fifth issue, regarding attorney's fees, and therefore we do not address that issue.